The Bank of the Republic *v.* Baxter et als.

---

THE BANK OF THE REPUBLIC *v.* A. SIDNEY BAXTER, H. HENRY BAXTER, THE METROPOLITAN BANK, AND THE BANK OF RUTLAND.

[IN CHANCERY.]

*Fraud. Payment. Remittance.*

S., a broker in New York city, had an arrangement with the Bank of the Republic, the orators, with whom he kept his bank account, that they should from day to day certify his checks for a larger sum than he actually had on

The Bank of the Republic *v.* Baxter et als.

deposit, with the express understanding that he should, before the close of banking hours on each day, deposit with them a sum sufficient to make good his checks certified on that day. This arrangement was entered into and continued by the orators in reliance upon the representations of S., that he was abundantly solvent, and fully able to make his checks good on each day, and that he would do so. This arrangement was acted upon for some time, each party complying with its terms, until the 31st of March, 1855, when S. having become insolvent, of which fact, however, the orators were entirely ignorant, procured his checks to be certified by them to the amount of fifteen thousand dollars more than his deposits, and failed to make them good before the close of banking hours on that day. After the bank closed that day, the orators not being aware that any of his checks were in a condition to be reclaimed by them, but supposing the contrary, received from S. his note for the amount of his overdraft, together with certain collateral security, which, however, turned out to be utterly valueless. It also appeared that S. was indebted to his brother H., who resided in Rutland, in this State, to the amount of seven thousand three hundred and fifty dollars, and that H. had previous to the 31st of March, requested him to pay this debt by depositing on that day that amount of money in the Metropolitan Bank to the credit of the Bank of Rutland. One of the checks certified by the orators for S. was for the same amount as this debt to H., and was deposited by S. on the 31st of March, in the Metropolitan Bank to the credit of the Bank of Rutland in conformity with the directions of H. On that day the Metropolitan Bank addressed a letter to the Bank of Rutland, as also did S. address one to H. of the same tenor, giving notice of this deposit. This check was paid by the orators to the Metropolitan Bank before they became fully informed of the facts relating to its procurement from them; but, by the request and agency of the orators, both the Bank of Rutland and H. were notified by telegraph by the Metropolitan Bank and S., respectively, that the payment of this check was stopped, and they were forbidden either to draw or advance anything upon such deposit; and this telegraphic notice reached them before they received any notice of the deposit. The orators thereupon brought a bill in chancery to enjoin any further proceedings by the parties in reference to this check, except that the Metropolitan Bank or H. should be decreed to pay the amount thereof to the orators.

*Held,* that the business of certifying checks was one requiring the most perfect good faith on the part of the drawer; that S. must be presumed to have known his insolvency in the absence of any proof to the contrary; that it was a fraud upon the orators for him to obtain any checks to be certified after he became insolvent, and was unable to make them good according to the agreement; and that, therefore, the orators had a right to reclaim or countermand the payment of the check or the money represented by it, unless it had been previously *paid* to a *bona fide* creditor of S., without notice on his part of the fraud by which it was procured.

*Held,* also, BENNETT J. dissenting, that the deposit of the check in, and its payment to the Metropolitan Bank, did not amount to a *payment* to H., because this was not done in .conformity with any previous arrange-

The Bank of the Republic *v.* Baxter et als.

ment between him and the Metropolitan Bank; that there was no privity between him and the Metropolitan Bank, and consequently no payment to *him* until he had received notice of the deposit and had assented thereto; that until then the payment of the check was countermandable by the orators; that it was so countermanded and notice thereof given to the Bank of Rutland and to H. before they received notice of the deposit; and that therefore the right of the orators to the money represented by the check was superior to that of H.

*Held,* also, that this right of the orators to the money represented by the check was not, under the circumstances above detailed, affected by the fact of taking the note of S. and the collateral securities for his overdrafts.

APPEAL from the decree of the court of chancery. The bill set forth that the complainants were a duly organized corporation engaged in the business of banking in the city of New York; that the defendant A. Sidney Baxter was previous to and on the 31st of March, 1855, a broker in New York, and had for some time previous to that date kept a bank account with the complainants; that they, relying on frequent representations of his solvency, made to them by A. S. Baxter previous to that time, had for his accommodation frequently certified his checks upon them for a greater sum than the amount of his deposits at such times, with the understanding and the assurance from him that he would deposit with them before the close of banking hours on the days, on which they so certified his checks, a sufficient sum to make the checks good; that A. S. Baxter was insolvent on the 31st of March, 1855, but that the complainants relying on his previous representations supposed him then to be solvent; that on the morning of that day, in accordance with the understanding above mentioned, he procured the complainants to certify his checks to the amount of nearly fifteen thousand dollars more than he had then on deposit; that one of the checks so certified on that day by the complainants was for seven thousand three hundred and fifty dollars, and was payable to one G. C. Tracy, who was a clerk or partner of the defendant A. S. Baxter; that this check was indorsed by Tracy, and was on the same day, that it was certified, deposited in the Metropolitan Bank of the city of New York to the credit of the Bank of Rutland, for the pretended use of the defendant H. Henry Baxter, then and now of Rutland, Vt., and that the cashier of the Metropolitan Bank on the same day addressed

and sent to the Bank of Rutland a letter advising them of the said deposit for the use of H. H. Baxter; that on the close of banking hours on that day the complainants became apprised of the insolvency of A. S. Baxter, and gave notice to the Metropolitan Bank that this check for seven thousand three hundred and fifty dollars had been procured to be certified by them by the fraud of A. S. Baxter, and directed the Metropolitan Bank not to pay it to the Bank of Rutland, or H. H. Baxter, or any person, and to surrender it to the complainants; that on the next business day, being Monday the 2d of April, 1855, the Metropolitan Bank telegraphed to the Bank of Rutland not to pay the amount of said check to H. Henry Baxter, and that this telegraphic communication was received by the Bank of Rutland previous to the letter advising them of the deposit written on the 31st March, as above mentioned; that A. S. Baxter on the 2d of April, 1855, by demand of the complainants gave notice by telegraph to H. H. Baxter at Rutland, not to use the avails of said deposit as the payment of said check had been stopped, and that this telegraph notice reached H. Henry Baxter before he received any notice of said deposit in the Metropolitan Bank; that the complainants and A. S. Baxter on the 31st March, 1855, after banking hours and before either the Bank of Rutland or H. Henry Baxter had received any notice of such deposit, agreed that the payment of said check should be stopped, and that the check was to be re-delivered to the complainants; that the telegraphic notices above mentioned were sent in pursuance of said agreement; that neither G. C. Tracy, nor the Bank of Rutland, nor H. H. Baxter had ever given any consideration for said check, and that the complainants have never received anything for certifying said check, but that it was certified in entire ignorance of the insolvency of A. S. Baxter, and by reason of his false and fraudulent representations aforesaid.

The bill prayed that the Metropolitan Bank might be decreed to pay to the complainants the amount of said check; that the Bank of Rutland and H. H. Baxter might be enjoined from proceeding at law, or otherwise, against the Metropolitan Bank on account of said deposit of said check in that bank; that the Bank of Rutland might be enjoined from paying the amount of the

check to H. H. Baxter, and that H. H. Baxter might be enjoined from proceeding at law against either of the parties aforesaid on account of said check, or else that he be decreed to pay the amount thereof to the complainants. The bill concluded with a prayer for general relief.

The defendants severally answered the bill, and voluminous testimony was taken on both sides. The material facts in the case are sufficiently set forth in the opinion of the court. The chancellor dismissed the bill, from which decree the complainants appealed.

*Linsley & Prout* and *E. J. Phelps*, for the orators, insisted upon the evidence, that the check was procured to be certified by the fraud of A. Sidney Baxter, and that although H. Henry Baxter might not be cognizant of the fraud, both the legal and equitable right of the orators to the check was superior to his ; that its deposit in the Metropolitan Bank was not a payment of that amount of money to H. Henry Baxter, but merely a means of remittance ; that this remittance was countermandable ; that the check was not received by the Metropolitan Bank by virtue of any contract or agreement either with the Bank of Rutland or H. Henry Baxter ; that the payment of the money was countermanded by the telegraph dispatch before the Metropolitan Bank had parted with anything on account of it ; that before the money was actually received by H. Henry Baxter, it was subject to all equities existing between A. Sidney Baxter and the orators ; that Sidney gave up all right to the check to the orators, and gave Henry notice that its payment had been stopped before the latter received any notice even of its deposit.

They also claimed that the case was not altered by the fact that the orators took a note and securities of A. S. Baxter for the amount of his overdrafts, because this was done immediately after they learned of his insolvency, and before· they discovered that the check in question had been so disposed of that its payment could be stopped ; and also because the note and securities were utterly valueless ; also because it did not appear that they had parted with the securities, and they might surrender them on trial, as held in *Poor* v. *Woodburn*, 25 Vt. 239.

In support of these views they cited the following authorities: 2 Story's Eq. Jur., secs. 972 (and note), 1046, 1047, 1196; Chitty's Cont. (5 Am. Ed.) 615 et inf.; *Yates* v. *Bell*, 5 Eng. Com. Law 409; *Williams* v. *Everett*, 14 East 582; Chitty on Bills, 90, 91; *Brettan* v. *Bishop*, 11 Vt. 72; 20 Eng. Com. Law 437; 10 Wend. 85; 9 *Id.* 170; *Starkne* v. *McDaniel*, 6 Hill; 17 Eng. Com. Law 94; *Fitzsimmons* v. *Joslin*, 21 Vt. 129; *Fisher* v. *Miller*, 8 Eng. Com. Law, 279.

*Charles L. Williams*, for the defendants, insisted, 1st, that there was no fraud on the part of either of the Baxters, and cited on this point *Reddington* v. *Roberts*, 25 Vt. 686; 2nd, that the orators by taking A. S. Baxter's note and collateral security for the amount of his over checks, and retaining the same, were precluded from making the claim, and cited on this point *Bowen* v. *Buck*, 28 Vt. 314; *Poor* v. *Woodburn*, 25 Vt. 240; 3d, that the check, when paid into the Metropolitan Bank to the credit of the Bank of Rutland for the use of H. Henry Baxter, became his property, particularly as this was done in pursuance of his directions, and therefore, his rights, being those of a *bona fide* creditor of A. S. Baxter, and having accrued previous to any notice that the payment of the check was stopped, were superior both in law and equity to those of the orators.

POLAND, J. We are all of the opinion that the check for seven thousand three hundred and fifty dollars, procured by A. S. Baxter from the orators on the 31st day of March, 1855, was obtained by such a fraud on his part as to invalidate the transaction between them, and such as would authorize the orators to reclaim the check or the money paid upon it as against him. The several members of the court are not all prepared to find that A. S. Baxter had a fixed and settled determination prior to the 31st of March, or on that day, to procure as large an amount of these certified checks as possible from the orators and then fail to meet them by deposits on that day, or even to make any ultimate payment of them, though there are many circumstances in his conduct that point very strongly in that direction. But we are all satisfied that this check was obtained by him from the bank under

such false assurances to the orators in relation to his pecuniary means and ability to pay such accommodation checks, as to render his conduct fraudulent, and to authorize the orators to rescind the transaction and claim to have the check, or the money drawn upon it, restored to them. It is apparent from all the evidence in relation to this practice of advancing these *certified* or *accommodation* checks by banks to brokers beyond their deposits, that it is one in which the strictest and utmost confidence and good faith are understood and expected, so far as these terms can be properly applicable to a transaction which is in fact and effect only a loan of money from the bank to the broker.

In form, it is an admission or agreement by the bank that the broker has funds in their hands that he is entitled to check out, when in fact he has not.

The very nature of the transaction, and the conceded course of business in relation to it, shows the scrupulous fidelity and punctuality that are required and expected; the funds are to be provided to meet the checks, not only upon the very day on which they are drawn, but by three o'clock of that day. It is manifest enough that no bank would enter upon any arrangement of this sort with a broker, without the fullest assurance from the broker of his means and ability to perform and fulfill the arrangement on his part, and to suppose that such advances would be made by a bank to a man destitute of means, relying upon his chance for a lucky speculation wholly, or upon borrowing the money from some kind but unknown friend, to meet them, this being known to the bank, is quite past belief. But the defendant, A. S. Baxter, in his answer concedes that he did make such representations to the orators to induce them to enter into this arrangement with him, as they claim, that he was amply responsible to meet his engagements and to make good his daily deposits as required by this arrangement, but he denies that he renewed these representations on the 31st of March, or that he had made them for some considerable period before that day. But we think it wholly immaterial whether they were renewed that day, or how recently before that day they had been made, because the very nature of the business necessarily implied that such understanding existed and continued so long as the practice itself continued.

A. S. Baxter must have known that the orators never would have commenced with him except upon the fullest understanding that he had the ability to, and punctually would fulfill on his part, and that it would not be continued for a day longer than such belief and confidence existed.

It is not necessary to enter into the details of the evidence as to the pecuniary condition of A. S. Baxter on the 31st of March, when this check was drawn and accepted. It is encugh to say, that from all the evidence in the case we are all satisfied that he was at that time hopelessly insolvent, not only lacking the means to pay his debts which fell due on that day, but lacking the means to eventually pay them, with the aid of all necessary time to convert his assets into money. In any sense of the word, either legal or popular, we think he was on that day insolvent. That he knew what was his real pecuniary condition there seems no fair ground to doubt, and unless there be some evidence from which it can be inferred that a man does not know his own pecuniary standing, it is not to be presumed.

It is not claimed that he did not know the amount he owed, or the state of his assets, and these being known, his insolvency was a conclusion easily to be drawn. He drew from the orators nearly fifteen thousand dollars, most of which was applied in payment of debts, and still he was unable out of any means he had to pay his other debts, except at a great discount.

It does not appear that he was disappointed in not receiving money on that day from any business source where he expected it, but he hoped to make some profitable speculation by which to raise it, and if that failed, to borrow the money of his friends; but it is not claimed that he had any specific speculation in view, or that he had any arrangement made for a loan of money, or even that he had in mind to whom he was to apply for it. If (as we charitably hope) he had some vague, undefined hope that he might by some unknown stroke of fortune be able to meet his checks on that day, still, he must have known that had the orators known that this was his sole dependence to furnish them with deposits, he would not have been permitted to overdraw a dollar.

We think that under the relation existing between him and the bank, he had no right to cast the risk of his adventure upon

them ; that he might as well be permitted to aver that he expected to meet his checks by money he hoped to win of somebody by cards or dice. These views we think are fully supported by the case of *Fitzsimmons* v. *Joslin,* 21 Vt. 129.

The result of this conclusion would be, that if this check had not been paid by the orators, A. S. Baxter could not have enforced payment of it against them, nor could they have been compelled to pay it to any one except a *bona fide* holder for value, who took it without notice of the fraud practiced in its procurement.

It is needless now to inquire whether one who received it in payment of an already existing debt would be considered as a *bona fide* holder or not, in which respect we understand the law of New York to differ from the law of this State.

If A. S. Baxter received the money, and with it paid a just debt due from him, or if the money was paid on the check by his direction to a creditor of his who was in no way cognizant of the fraud, we apprehend such payment would vest the title to the money in the creditor, so that the orators could not, either at law or in equity, recover it back. The defendants claim, that in this case the money had in effect been paid to H. H. Baxter before he had any notice of the manner in which it was obtained. There is no particular controversy upon the evidence as to the facts upon this part of the case.

A. S. Baxter was indebted to H. H. Baxter in the same sum of this check, for stock previously sold for him by Tracy & Baxter, and H. H. Baxter had written to his brother, as he states in his testimony, to place the amount in bank to the credit of the Bank of Rutland. A. S. Baxter in his testimony says, his brother wrote to him to deposit the amount in the Metropolitan Bank. In our view it is not material to determine which is right. The check when obtained, was immediately deposited by A. S. Baxter in the Metropolitan Bank, and by them credited to the Bank of Rutland for the use of H. H. Baxter, and a letter was immediately addressed by the Metropolitan Bank to the Bank of Rutland, informing them of such deposit and credit. Before the reception of this letter by the Bank of Rutland, they were notified by telegraph from the Metropolitan Bank by the procurement of the orators, not to make any payment upon this credit as there

was something wrong. H. H. Baxter was also notified by telegraph .from A. S. Baxter that payment of this check had been stopped, which notice was received by him as early, at least, as he received notice of the deposit, and before he had in any way acted upon it. The orators however, before becoming fully informed of the facts relating to the procurement of the check from them, had paid the money on the check to the Metropolitan Bank, and the defendants claim, that in law, this was a payment of the money to H. H. Baxter upon his debt against A. S. Baxter, and so vested the title to the money in him beyond recall by the orators. This involves an inquiry into the legal effect of such payment. It is not claimed that there had been any communication whatever between H. H. Baxter and the Metropolitan Bank, upon the subject of said check or deposit, or that they had any knowledge that such deposit or payment was to be made to them, until it was made, or that they assumed any obligation in relation thereto to H. H. Baxter, except by receiving the same, and making the credit as directed, and mailing a letter to the Bank of Rutland as before stated.

Under these circumstances, was the Metropolitan Bank the agent of H. H. Baxter, so that the reception of the money by them was in law a payment to him? The leading English case on this subject is that of *Williams* v. *Everett et al.*, 14 East 582. In that case Kelly, who was indebted to the plaintiff in the sums of three hundred and five hundred pounds, remitted from the Cape of Good Hope to the defendants, who were brokers, certain bills of exchange, with written instructions that when collected the proceeds should be paid to certain specified creditors of Kelly, and among them was .the plaintiff. The defendants received the bills, with these instructions, collected the money upon them, but refused to pay over the sum, directed by Kelley to be paid to the plaintiff. The plaintiff brought an action for money had and received to his use, but it was held that the action could not be maintained, for the reason that no privity existed between the plaintiff and the defendants. The doctrine of this case has ever since been recognized by the English courts in repeated decisions. The principal cases since *Williams* v. *Everett* are *Yates et al.* v. *Bell et al.*, 3 B. & A. 643 ; 5 E.

The Bank of the Republic *v.* Baxter et als.

C. L. 409 ; *Wedlake* v. *Henley et al.*, 1 Cromp. & Jer. Ex. R. 82 ; *Brind* v. *Hampshire*, 1 Mees. & Welby 365. In the last named case, Usher, resident in Honduras, remitted a bill to the defendant, his agent in England, specially indorsed to the plaintiff, with whom Usher's children were at school, in payment of the plaintiff's account for their board and education. The defendant procured the bill to be accepted by the drawees, and sent a letter by post to the plaintiff, stating that he had received a commission from Usher to pay her some money on account of his children, and desired to be informed when and how it should be delivered. While the bill remained in the defendants hands he received directions from Usher to keep it and the proceeds in his hands, and to have a fair investigation into the plaintiff's accounts, and after such investigation, to pay what might be due to her. No investigation took place and the defendant detained the bill. The plaintiff brought an action of trover for the bill, but it was held that the action would not lie, and that notwithstanding the notice sent by the defendant to the plaintiff, the defendant still held the bill as the agent of Usher, and not of the plaintiff, and that the title to the bill was not transferred to the plaintiff. Baron PARKE says : " with regard to the communication made by the defendant to the plaintiff, even supposing it to have been that he held the bill for her use, that would not have the effect of transferring the property ; the directions remain countermandable by the remitter until they are executed, either by the actual delivery of the chattel or money to the remittee, or by some binding engagement entered into between the agent and the remittee, which gives the latter a right of action against the former." For other cases in England in support of the same doctrine, see Chitty on Contracts, pages 615, 616, 617, and cases cited in the notes. The doctrine of these cases seems also to be fully adopted in this country. 2 Story's Eq. J. sec. 1042 to 1046, and cases cited in the notes.

Judge STORY says, in section 1045 : " In regard to the other class above suggested, namely those where the question may arise of an absolute appropriation of the proceeds of an assignment or remittance, directed to be paid to particular creditors, courts of equity, like courts of law, will not deem the appropriation to the creditors absolute until the creditors have notice there-

of, and have assented thereto. The true test whether an absolute appropriation is made out or not, depends upon the point at whose risk the property is, and until the creditor has consented, the property will clearly be at the risk of the assignor or remitter. But if upon notice, the creditors should assent thereto, and no intermediate revocation should have been made by the assignor or remitter, then in equity, the assignor or mandatary will be held a trustee for the creditors, and they may maintain a bill to enforce the due performance of the trust."

In section 1046, Judge STORY further says: " It is true that in every case where a consignment or remittance is made with orders to pay over the proceeds to a third person, the appropriation is not absolute, for it amounts to no more than a mandate from the principal to his agent, which can give no right or interest to a third person in the subject of a mandate. It may be revoked at any time before it is executed, or at least, before any engagement is entered into by the mandatary with a third person to execute it for his benefit, and it will be revoked by any prior disposition of the property inconsistent with such execution."

It is true, that there are some cases to be found where it has been held that if A. pay money to B. for the use of C., the latter may maintain an action for money had and received, to recover the money from B.

These decisions have gone upon the ground that B. had in his hands money, which in equity and good conscience belonged to C., and that as the action for money had and received is said to be an equitable action, they would allow it to be sustained, and not drive the party to the more expensive and tardy remedy in a court of chancery. It has not been held in these cases that there was any legal privity between the plaintiff and the defendants, until there had been some agreement or contract entered into in some form between them, nor that until then, the depositor might not countermand the direction to pay, or that any other person having, as against the depositor, a good title to the money, might not, up to that time, assert his title to the money and recall it.

Applying these principles to the present case, we think that the Metropolitan Bank can not be regarded as the agents of H. H. Baxter in any such sense, that the reception of this check, or

the money paid upon it, was equivalent to a reception of it by him, so as to vest the legal title in him. The acceptance of the money by the Bank, and fowarding notice of that to the Bank of Rutland, was undoubtedly one step in the direction of perfecting a legal interest in this recovery in H. H. Baxter, but as there had been no previous communication with, or appointment of the Metropolitan Bank to receive this deposit for him, the legal title would not vest in him until notice of the deposit had been received and assented to by him, so as to create a legal privity between him and the Bank. Until this was created, we think the bank were under no legal obligation to him, and that the payment might be countermanded by the depositor, and that any party having a legal right to the money as against A. S. Baxter might assert that right and reclaim the money.

If the check or the money deposited was the money of A. S. Baxter, and was not countermanded by him until H. H. Baxter had notice of it, and assented thereto, it would undoubtedly operate as an equitable assignment of the fund and raise a trust in his favor against the bank, which he could enforce in equity if the bank refused to pay the deposit to him ; though no specific promise or contract was entered into by the bank to that effect, it would be implied from their having received the funds, and could be enforced when assented to by the creditor ; see Story's Eq. Juris. 2d vol. and sections above cited. But as the interest of H. H. Baxter in this fund, as it stood when the orators reclaimed it, was an equitable interest merely, and not a vested legal right, it must yield to any legal right, or even a superior and higher equitable interest, in favor of any other person to the fund as against A. S. Baxter, the depositor. In this view of the case, what are the relative rights of the orators and H. H. Baxter, as to this fund?

As between the orators and A. S. Baxter, the orators never parted with the legal title, or rather they were allowed to re-assert their legal title on discovering that they had been overreached and defrauded of the money by him, and they could reclaim it against him or any other person, except some one who had advanced some consideration or yielded some right upon the faith and credit of the fund. H. H. Baxter's only ground of claim to the

fund is to apply it in payment of a debt against his brother A. S. Baxter. This debt was created some time before the making of this check, and without any reference to it or reliance upon it. No application was ever made upon his debt and no discharge or surrender of his debt was ever executed, but the same is still in force, unless it has been subsequently paid. No forbearance or delay was ever granted of his debt; in short, it is not claimed that he ever performed any act, or failed to perform any, or ever parted with any consideration, or yielded any right or advantage on the credit of this fund. The first knowledge he had of the deposit was, that the orators had reclaimed the money, and that payment to him was stopped. Upon this comparison of the respective rights of these two claimants of this money, we think there can be but one opinion, that is, that the orators' right, not only in natural and substantial justice, but in law and equity, is quite superior to that of H. H. Baxter.

These views dispose of the case, except as to the defence set up arising from the taking by the orators of the note of A. S. Baxter for the amount of his overdrafts, and a deed of his interest in the marble quarry, to secure its payment.

It is insisted by the defendants, that the facts, relative to the taking of this note and collateral security, bring this case within the principle of a class of cases where it has been held that where a purchase of goods is effected by some fraud of the purchaser, that entitles the seller to rescind the sale and reclaim his goods, the seller can not treat the sale as void and reclaim his goods or maintain trover for them, and at the same time insist upon retaining the securities taken for the price, and attempt to enforce payment of them. The doctrine of these cases is undoubtedly sound. It would be unjust and absurd to allow a party to both *affirm* and *disaffirm* the same contract, and to allow him to pursue even a fraudulent purchaser upon his contract, and also a wrong doer, upon the ground that there was no valid contract.

But for several reasons we think the taking of this note and security and retaining it, afford no valid reason why the orators should not be entitled to reclaim this money. The orators took the note and security on his marble quarry stock on the 31st March, 1855, directly after banking hours, and at this time all they knew

of the circumstances was, that A. S. Baxter had obtained of them certified checks for nearly fifteen thousand dollars above his deposits, and from what he said, they had every reason to suppose that these checks had all been put into circulation and gone into the hands of *bona fide* holders, so that they would be compelled to pay them. In this state of facts, they took A. S. Baxter's note for the amount of the overdrafts, and this marble stock, which was all they could obtain, and all was taken as collateral security.

Now this was not a security taken on the loan of the money originally, nor as any evidence ·of that contract, but after the party who had been defrauded had discovered it, but supposed his only remedy for his loss must be against the party who had defrauded him. Now we are not prepared to say, that a party who had been defrauded of money or goods, and while it is uncertain whether they can be reclaimed or not, succeeds in getting some collateral security of the wrong doer, may not retain it till he ascertains whether his money or goods can be restored to him, or that such retention will of itself be any affirmance of the original sale or loan.

But however that may be, it is clear from the evidence that all the security that the orators obtained from A. S. Baxter in this way, was by no means sufficient to cover the amount of his overdrafts, aside from the particular check now in controversy.

The orators had certainly the right to retain the security to that extent, without prejudice to their right to rescind and reclaim the money upon this check.

The evidence does not show they ever claimed to hold it for more than this, and none of the evidence in the case tends to show that it ever was anything like a sufficient security to the extent of the overdrafts the orators were compelled to pay. Indeed, we are satisfied from the evidence that this security is wholly valueless, and that the orators will never be able to realize anything whatever from it.

The result is, that the decree of the chancellor dimissing the bill is reversed, and the case is remanded with directions to the court of chancery to enter a decree in favor of the orators according to the prayer of the bill, and to allow costs to the orators against the two Baxters, but not against the other defendants.

BENNETT, J., dissenting.   Upon the best examination which I have been able to give this case, I have not been enabled to bring my mind to the same conclusion as my brethren.   Though, for the purposes of the present argument, we may admit the ground assumed by the court, that A. S. Baxter was guilty of bad faith in his representations to the orators in regard to his ability to pay the accommodation checks, which the bank *certified* to be good ; and that the bank, as between themselves and A. S. Baxter, had the right to repudiate the transaction on the ground of *fraud*, and recall these moneys from A. S. Baxter or from the Metropolitan Bank, so long as they were the moneys of A. S. Baxter and subject to his control, yet I think an absolute *appropriation* had been made of the money to the use of H. H. Baxter, by his previous direction, who was a *bona fide* creditor, and that it at once became *irrevocable* and *absolute*, without any further action, and that this is not a case where the *trust*, assumed by the Metropolitan Bank to pay the money to the Bank of Rutland for the use of H. H. Baxter, remained *countermandable* until H. H. Baxter had received actual notice of the deposit, and that this is not a case requiring notice.   In short, I hold it to have been an *executed* transaction, and that upon the deposit of the money in the Metropolitan Bank, A. S. Baxter ceased to have control over it, and that it having gone beyond the control of A. S. Baxter, it was equally beyond the control of the Bank of the Republic.   There is no evidence to connect H. H. Baxter with any bad faith or false representations of A. S. Baxter, and indeed I do not understand that the case is put on any such ground.   H. H. Baxter was an honest *bona fide* creditor of A. S. Baxter, and he writes to him at New York to deposit the amount due him, " *in bank*," to the credit of the Bank of Rutland, for his use. A. S. Baxter thinks the direction was to deposit the amount in the Metropolitan Bank to the credit of the Rutland Bank.   It is no doubt immaterial which of them is correct in this particular. The legal effect, I apprehend, would be the same in either event. A. S. Baxter deposits in the Metropolitan Bank his *certified* check upon the Bank of the Republic, which the Metropolitan Bank accept as so much cash ; and by the direction of A. S. Baxter, they pass it to the credit of the Bank of Rutland, to the use of

H. H. Baxter, and the check is at once paid by the Bank of the Republic to the Metropolitan Bank. When A. S. Baxter deposited this money in the Metropolitan Bank, for a specific purpose, the acceptance of the money by the bank for that purpose, (and this is abundantly established by their passing it to the credit of the Rutland Bank for the use of H. H. Baxter), amounted to a direct undertaking on their part with A. S. Baxter, that they would perform the trust and pay over the money according to the terms of the deposit. See 2 Story's Equity J. P. sec. 1041, and the authorities there cited.

In such a case it has been frequently held, that the person for whose use the money has been paid, may maintain an action at law for the same, against the bailee, without any further act or assent by the bailee, and this upon the ground that a *privity* is created between them, even at law, by means of the original undertaking, and to this effect is the case of *Treall* v. *Douglass et al.*, 1 Henry Black. 239, and *Farmer* v. *Russell*, 1 Bos. & Pul. 295; *Nelson* v. *Blight*, 1 Johns. Cases 205; *Weston* v. *Barber*, 12 Johns. 276, and many others. No doubt ever existed that a remedy could be had in equity, under such circumstances, it being *a matter of trust.* Chancery would compel a performance of the trust. But still the question returns, was the trust *countermandable* until H. H. Baxter had assented to the trust upon his receiving subsequent notice of the deposit, and this is the turning point in the case. Inasmuch as the deposit was not made by A. S. Baxter upon his own mere motion, but was made at the instigation of H. H. Baxter, and under his direction, I think, all the assent to the appropriation of the funds, on the part of H. H. Baxter, which can be necessary to render it *irrevocable*, is implied out of the original direction of H. H. Baxter, and if no further assent was necessary to make the appropriation *absolute*, then notice was of no importance. Notice would only be necessary for the purpose of showing *an assent.*

If a case arises, where the evidence or the circumstances of the case repel the presumption that the depositary or bailee agreed to receive, and did receive the money for the use of the person, for whom it was designed, quite a different rule obtains. Until there has been the assent of the depositary or bailee, expressed or

implied, there would seem to be no *legal privity* at law or in chancery *between him* and the person claiming the deposit. But that is not this case. The assent of the depositary is expressly inferred from the reception of the money, and the passing it to the credit of the Bank of Rutland for H. H. Baxter's ·use. There is not a fact in the case tending to repel this presumption.

The case of *Williams* v. *Everett et al.*, 14 East 532, which seems to be relied upon to sustain the decision now made, is clearly good law, but I apprehend it is as far from the case now before us, as light is from darkness. In that case *the defendants had refused expressly to act under their letter of instructions.* Lord ELLENBOROUGH, Ch. J. observes in his opinion, " that there was no *assent* on the part of the defendants to hold the money for the purposes mentioned in the letter, but on the contrary an *express refusal* to the creditor so to do. It was quite clear that in that case there could be no *implied assent,* so as to create a *privity* between the parties in the suit against the *express dissent* of the defendants, who were sought to be charged. In that case it might well be held, as it was, that the defendants, by the reception of the bill, agreed to hold it till paid, and when paid, to hold its contents for the use of the *remitter,* and subject to his entire control, until by some engagement entered into by themselves, the defendants had appropriated the remittance to the use of the person for whom it was designed, and then, it was well said, they would be bound to hold it for the use of the appointee, and could not retract the consent°they may have once given. That case turns altogether upon the *express refusal* of the defendants to undertake the performance of any trust in behalf of the person for whom the remittance was designed. So in the case of *Yates* v. *Bell,* 3 B. & A. 643, and in *Grant* v. *Austin,* 3 Price 53, and *Tiernan* v. *Jackson,* 5 Peters 597 ; there were circumstances in each case which repelled all presumption that the bailees had agreed to receive, or did receive the money for the use of the creditors, or at least, that no such assent was shown under the circumstances, and this should of course appear affirmatively. The case of *Brind* v. *Hampshire,* 1 M. & W. 365, was an action of *trover for a bill of exchange.* The bill was specially indorsed to the plaintiff to pay the plaintiff's account for the education of the remitter's children,

and was sent to the defendant, the agent of the remitter, who procured an acceptance of the bill by the drawees, and he then sent a letter to the plaintiff stating that he had received a commission from the remitter to pay her some money on account of his children, and desired to know when and how it should be sent her. In this situation the remitter directed the agent to keep the bill and its proceeds in his hands until a settlement of the plaintiff's account, and then pay her what was her due. No settlement took place and the defendant detained the bill. It was well said in that case, that trover would not lie for the bill. There was no binding contract between the agent and the remittee, to deliver her the bill, and Baron PARKE says : " that even supposing the defendant held the bill itself for the use of the plaintiff ; that would not have the effect to transfer the property in the bill to her, and of course trover could not have been maintained, if there had been no countermand." That case has very little analogy to the one at bar, and can not, I think, be relied upon as an authority for the decision now made. The case of *Wedlake* v. *Henley et al.*, 1 Crompton & Jervis 83, is decided upon the ground that though there was no express repudiation of the trust, yet the case did not by implication show an assent on the part of the defendant to hold the money in trust for the plaintiff, which was essential to create a *privity*, and such assent should affirmatively appear before the *privity* can be created. This case differs from the case in 14 East only in this, that there the dissent *affirmatively* appeared. The principle is the same in both cases.

In Story's Equity Jurisprud. sec. 1045, it is well said, " that courts of equity like courts of law will not deem the appropriation to creditors *absolute* until the creditors have notice thereof, and have assented thereto, and that until that time the mandate or direction may be withdrawn, and any other appropriation made by the consignor or remitter." This is true, no doubt, but the principle applies only to that class of cases where the appropriation on the part of the debtor is voluntary on his part, and made of his own mere motion, without any previous direction from the person in whose behalf the appropriation is made, as the cases will abundantly show. To apply it to the case now before the court is, I think, a flagrant misapplication of a well settled principle.

Justice STORY, in sec. 1196, speaking of implied trusts, says the most simple form is, that of money or other property delivered by one person to another, to be delivered over by such latter person to a third person for his benefit.    This he well treats as creating an *implied trust*, and this he says is not *absolute* under all circumstances, and then proceeds to say: " for if the trust *is purely voluntary*, and without any consideration, and the benificiary has not become a party to it by his express assent after notice, it is revocable, and when revoked the trust is gone, and an implied trust results in favor of the party who originally created it."    This limitation of *revocable trusts* is well marked by the authorities.

In the case at bar, the precedent indebtedness of A. S. Baxter was a sufficient consideration for the appropriation, and it having been made by the direction of H. H. Baxter, A. S. Baxter is not to be regarded as a volunteer in making it.    It is well said in the cases in 14 East and 5 Peters, that the true test, whether an *absolute appropriation* is made out or not, depends upon the point *at whose risk the property is*.    In the case of voluntary appropriations, the depositary is the sole agent and trustee of the depositor until the depositee has notice and assents to the transaction.    But in this case H. H. Baxter directs the deposit to be made " in bank," to the credit of the Bank of Rutland, or as A. S. Baxter says, in the Metropolitan Bank.    If the direction was general, to deposit the money *in bank*, I apprehend all that could have been required of A. S. Baxter would have been the selection of some bank in the city, of good credit, and that bank, when selected and the deposit made according to direction, would become the agent and trustee of H. H. Baxter, as much so as if the direction had been made to deposit in some specified bank, which had been done accordingly.    From the time this money was deposited in the Metropolitan Bank, it was, I think, at the risk of H. H. Baxter, and not at the risk of the depositor, if the direction was specific to deposit in this bank, or if it was general as to the bank, and the depositor used the requisite care in the selection of a bank.    This *test* then, as I think, most clearly indicates, as applied to the facts of this case, that the appropriation was *absolute*, and not countermandable.

It is true, as is said by Judge STORY in section 1046, if a

The Bank of the Republic *v*. Baxter et als.

remittance is made, with orders to pay over the proceeds to a third person, the appropriation is not *absolute*, and the reason is, because it is simply a *mandate* from the depositor, as a principal, to the depositary as his own agent, and can give no interest in the subject matter of the deposit to a third person, who stands as an entire stranger to the mandate. In such a case it may well be conceded that the deposit may be revoked at any time before the depositary has become liable to the person, for whose benefit the deposit was made, to execute the trust, but that we apprehend is not this case. The depositary, having been selected by H. H. Baxter, or by his directions, to hold the funds, and having, by giving the Bank of Rutland credit for these funds, as the trustee of H. H. Baxter, consented to the performance of their duty on their part, to me it is clear that the depositary held the funds from the time of their reception, as the agent and trustee of the person to whom they were to be remitted, and were at his risk. Both the equitable and legal interest in this money at the time of the attempted countermand, was, I think, in H. H. Baxter, or rather the legal interest was in the Bank of Rutland, as his trustee, and I think the Bank of Rutland could have well maintained an action at law against the Metropolitan Bank for its recovery, and that H. H. Baxter could well have enforced his equitable rights in a court of equity. If A. S. Baxter could not countermand the deposit, and it became absolute against him, the Bank of the Republic can not do it, as it is not claimed from the testimony that H. H. Baxter was in any way privy to the bad faith of A. S. Baxter, and he holds for a valuable consideration, and without even a pretence of notice of misconduct in A. S. Baxter, until after he had acquired for his own use and for a valuable consideration, the legal and equitable interest in the funds. I should affirm the decree of the chancellor in all things with costs.