## CHARLESTON.

CHEUVRONT v. CHEUVRONT.

Submitted June 4, 1903.   Decided November 21, 1903.

1.   CONTRACT—*Divorce—Fraud.*

    While it is a general rule that where a party who seeks to cancel a contract for fraud in its procurement the plaintiff must allege and show himself eager, ready and willing to place the other party to the contract in *statu quo;* yet in case of a wife who sues to annul a contract of separation and settling property rights between her husband and herself, and it is alleged that the execution of the contract was procured from her by false and fraudulent representations of defendant and his agent, falsely representing that it was the purpose of the defendant to live with and support the wife and the object of the contract to reconcile and restore their marital relations; and it sufficiently appears from said bill that plaintiff is not able to repay the money given her by the defendant to induce her to execute the contract. *Held,* not error to overrule the demurrer to the bill.   (p. 176).

2.   DEPOSITIONS.

    In order to have the advantage in the appellate court of objections to depositions being read in a cause, for want of proper authentication, or proper certification by the officer taking the same, the objections to the reading of the depositions, must be made in the court below and the defective authentication or certificate with the objection copied into and made part of the record as provided in section 6, chapter 135, Code.   (p. 178).

3.   CONTRACT—*Fraud.*

    In a suit brought by a wife against the husband to set aside and cancel a deed or contract between them for fraud in its procurement, by which contract the husband obtained an advantage over her, the burden of proof is on the husband to show that the wife was fully informed as to the effects of the transaction and also the utmost fairness thereof.   (p. 178).

Appeal and *supersedeas* from Circuit Court, Harrison County.

Action by Elizabeth Cheuvront against Joseph Cheuvront. Judgment for plaintiff and defendant appeals.

*Affirmed.*

D. H. LEONARD, for appellee.

W. S. STEWART, for appellant.

MCWHORTER, PRESIDENT:

This is a suit brought by Elizabeth Cheuvront against Joseph Cheuvront, her husband, and W. S. Stuart, trustee, to set aside a deed or contract entered into between them, dated the 30th day of October, 1899, because the same was procured to be signed and executed by her by fraud and misrepresentations. It appears from the allegations of the bill that said plaintiff and defendant Joseph Cheuvront were married on the 22d day of November, 1897. At the time of their marriage plaintiff was a widow having four children at home with her, the youngest being about 12 years of age. Plaintiff was living in Parkersburg, West Virginia, carrying on the grocery business, and where she continued to live until the 9th of January, 1898, when she removed to West Union in Doddridge county to live with her husband, a part of the time keeping hotel in what was known as the "Grant Hotel" until April 1898; that defendant treated plaintiff so cruelly that she returned to Parkersburg and rented a house and commenced keeping boarders for the purpose of maintaining herself and children; that the defendant failed to contribute to her support and she was compelled to support herself and family without any assistance from her husband; that she brought suit against her husband in the circuit court of Doddridge county in October 1898 for divorce and alimony, charging cruel and inhuman treatment, and charging defendant with being guilty of open and notorious acts of adultery and fornication with numerous females, and praying for money to pay her counsel fees and for alimony *pendente lite;* that while she was so conducting her boarding house W. J. Horner and his wife, Maggie Horner, on the 31st day of October, 1899 came to plaintiff's house with a deed or contract all ready prepared and represented to plaintiff that defendant Joseph Cheuvront was very anxious to become reconciled to plaintiff and that if plaintiff would

sign said contract and agree to dismiss her suit which was then pending in Doddridge county for divorce and alimony, that defendant Cheuvront would immediately come to Parkersburg and would reside with and take care of plaintiff and would treat her kindly and be a good husband to her; that said Cheuvront was rich, owned a large amount of property and was well able to support plaintiff who was wearing her life out at hard work and drudgery in and about her boarding house and earning money for the support of her and her four children who were living with her; that Horner claimed to be representing her husband as his agent and offered to pay plaintiff four hundred dollars if she would sign said contract and become reconciled to her husband Joseph Cheuvront; that at the time, plaintiff was sick and nervous and had a great desire to have a home and be reconciled, and re-united to said Cheuvront if he would live and cohabit with her and treat her kindly and be a husband to her, and that without consulting anyone, not even her attorneys in said suit and without properly understanding the contract with the assurance that said defendant would immediately go to Parkersburg on the same night, and with a promise that said Horner would at once telephone for him to come, plaintiff accepted the four hundred dollars and signed the contract; that plaintiff afterwards learned that Cheuvront had employed Horner as his agent and had given him $750 to pay to the said plaintiff providing she would sign the contract and that Cheuvront had no intention of coming to live with plaintiff, but that said contract was gotten up and prepared for the purpose of defrauding the plaintiff out of her marital rights as his wife and that Horner made said promises for and on behalf of Cheuvront as his agent, which were false and which he knew to be false at the time, and that Cheuvront had no intention whatever, of carrying out said promises; that Horner brought a notary public to plaintiff's house and had her acknowledge, after signing said contract; that she would not have signed it had she understood it and that she was induced to sign the same through fraudulent misrepresentations of Horner and his wife, agents of said Cheuvront; that said contract was gotten up with a great deal of skill by an attorney learned in the law and purporting to be between plaintiff and W. S. Stuart, trustee, of said Cheuvront and was made for the express purpose of defrauding plaintiff out of her rights of

support and dower in the large estate of said Cheuvront; that plaintiff had no knowledge of the true intent, effect and meaning of the said contract and was much surprised when she ascertained that her husband refused to come to Parkersburg and live with her, and was surprised to find that by said contract she had released defendant from all claim for support or dower in all or any part of his property, which property was carefully described and set up in said contract; that according to the expectancy of life her dower rights in said property would be quite valuable; that she had no separate property of her own and had to rely upon her own labor and exertions to maintain herself and children; that it was represented to her that it was a contract for the purpose of dismissing her said suit for divorce and alimony and that as soon as she signed said contract and gave an order to dismiss the suit said Cheuvront would come and reside with her and maintain and support her and treat her as he should treat a faithful and deserving wife; that after defendant had so fraudulently procured the dismissal of said suit he wrote affectionate letters to plaintiff asking her to meet him at Pennsboro in the county of Ritchie where plaintiff did meet him about the 19th or 20th of November, 1899, where they roomed and cohabited together, sleeping in the same bed at a hotel from Saturday until Monday morning, which said Joseph Cheuvront did in furtherance of the fraud so practiced upon her after the contract was obtained from her and by him placed upon record for the purpose and with the intention of preventing plaintiff from bringing another suit for divorce and alimony against him, and praying that the contract might be cancelled, annulled and held for naught and that she be entitled to her marital rights as though said contract had never been signed by her; and for general relief.

The defendants filed their demurrer and separate answers to the bill, denying the material allegations thereof and especially denying all fraud in the procurement of the contract sought to be set aside.

The defendant, W. S. Stuart's answer alleged that he was applied to by W. J. Horner on behalf of plaintiff for the purpose of settling and compromising the divorce suit mentioned, in Doddridge county, in which respondent was counsel for Joseph Cheuvront; that he brought the matter to the attention of Cheuv-

ront who consented to such compromise if it could be done on certain terms and conditions before that time offered to plaintiff through respondent, his attorney, at Parkersburg and directing respondent to carefully prepare such papers as would be binding between them and that would forever settle the matters in difference between them, which respondent did to the best of his skill and ability, the original of which contract was filed as an exhibit with the answer of Joseph Cheuvront in this cause; that Cheuvront paid over to Horner for plaintiff the sum of $750 in respondent's presence and took Horner's receipt for the same, which receipt was filed as an exhibit with Cheuvront's answer; that respondent says he knew nothing personally about what took place or was said between the plaintiff and Joseph Cheuvront or between Horner and his wife and the plaintiff; but denied that the deed or contract was prepared for the purpose of taking advantage of the plaintiff or for the express purpose of defrauding her out of her rights of support and dower in the large estate of Cheuvront as alleged in the bill so far as he knew or had any information; and alleged that there was such an ante-nuptial contract between the plaintiff and defendant as recited in the deed, and denied each and every material allegation in the bill not admitted in the answer to be true.

Depositions were taken and filed in the cause and the same was heard on the 23rd day of May, 1901, upon the bill and exhibits and upon the demurrer which was argued and overruled and upon the exceptions and answers of the defendants and general replications thereto and upon the proofs filed by the plaintiff and the defendant, on consideration of which the court was of opinion that the plaintiff was entitled to have the contract or deed of the 30th of October, 1899, and recorded in the clerk's office of the county court of Doddridge county cancelled, annulled, set aside and held for naught and so decreed accordingly and gave decree for costs in favor of plaintiff against the defendant Joseph Cheuvront and provided that "This decree is without any prejudice or passing on any of the rights of the parties under any other contract if any such exists."

The defendants appealed from said decree and assigned as errors the overruling of the demurrer of the defendant's to the bill of complaint and not sustaining the said demurrer and dismissing the said bill of complaint and in cancelling and annulling

and setting aside the deed of trust or contract dated the 30th day of October, 1899, and decreeing costs against the defendant Cheuvront.

Appellants insist that the old maxim "That he who seeks equity must first do equity" applies to this case and that the plaintiff cannot maintain her suit to set aside the contract without placing the appellant in *statu quo;* that she must allege that she had tendered or was ready to refund to him the $400.00 he paid to her at the execution of the contract and that the failure to allege such tender in her bill or to make offer of payment thereof was fatal to the bill and for that reason the demurrer should have been sustained, and cite Hogg's Equity Principles, section 60, page 100, where this principle is laid down, and also cite *Worthington* v. *Collins,* 39 W. Va. 406, (syl. pt. 1), where it is held: "Where an agreement is rescinded the general rule is that it must be rescinded entirely and the parties be placed, as near as may be, in *statu quo,*" and also *Christian* v. *Vance,* 41 W. Va. 754 (syl. pt. 1), "A party who seeks to cancel a contract of sale because of mutual mistake must allege and show himself prompt, eager, ready and willing to place the other party to such contract in *statu quo.*" As a general proposition of law this is correct. It is the general rule where the transaction is purely of a commercial nature or solely applies to property rights that a party proposing to rescind a contract should place his adversary in *statu quo.* Appellants also cite Hogg's Equity Procedure, section 904, where the form of bill is given for the cancellation or rescision of a contract on ground of fraud, showing that one of the requirements is, to bring into court for the purpose of having the same delivered to the defendant, the money received by the plaintiff, from the defendant, so as to place him in the position he was in before the contract sought to be rescinded was made. This form of contract and the cases upon which it is based are all of the nature of the sale of property where no other questions are involved than those of money and property rights. This doctrine has been carried so far, and properly, perhaps, that even where the plaintiff is unable to restore that which he had received under the contract, from misfortune or otherwise, a court of equity will refuse to grant him relief; but the contract or deed sought to be cancelled in case at bar is of a very different character. It is a contract made be-

tween parties sustaining the most sacred and confidential relations to each other known to our civilization. It sufficiently appears from the bill that the plaintiff was unable to restore to the defendant the $400 received by her upon the execution of the contract. The relations of the parties were such that it was the duty of the defendant to assist the plaintiff, and it clearly appears that he was amply able to perform his whole duty in that regard, and to require the plaintiff to return to the defendant the $400.00 before she could be heard upon her complaint to set aside the alleged fraudulent contract would be simply a denial of justice to her. In treating of this class of cases Mr. Story, in his first volume on Equity Jurisprudence, section 218 says: "But by far the most comprehensive class of cases of undue concealment arises from some peculiar relation or fiduciary character between the parties. Among this class of cases are to be found those which arise from the relation of  *  *  *  husband and wife.  *  *  *  In these and the like cases the law, in order to prevent undue advantage from the unlimited confidence, affection, or sense of duty which the relation naturally creates, requires the utmost degree of good faith (*uberrima fides*) in all transactions between the parties. If there is any misrepresentation, or any concealment of a material fact, or any just suspicion of artifice or undue influence, courts of equity will interpose, and pronounce the transaction void and, as far as possible, restore the parties to their original rights." Also in section 307, Mr. Story in speaking of constructive frauds which arise from some peculiar confidence or fiduciary relation between the parties says: "In this class of cases there is often to be found some intermixture of deceit, imposition, overreaching, unconscionable advantage, or other mark of direct and positive fraud. But the principle on which Courts of Equity act in regard thereto stands independent of any such ingredients, upon a motive of general public policy; and it is designed in some degree as a protection to the parties against the effects of owerweening confidence and self-delusion, and the infirmities of hasty and precipitate judgment. Courts will therefore often interfere in such cases, where but for such a peculiar relation they would either abstain wholly from granting relief or would grant it in a very modified and abstemious manner." See also second Pom. Eq. Jur. sections 955-56 in the latter of which sections it is said: "Wherever two

persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed." In *Darlington's Appeal,* 86 Pa. St. 512, the rule was applied to a deed made by a married woman shortly after marriage whereby she conveyed her real estate to her husband, it was held: "That a confidential relation exists between man and wife; that where there are transactions between them, courts will apply the same rules which govern dealings between attorney and client, principal and agent, guardian and ward, trustee and *cestui que trust;* and will require, when the husband claims the benefit arising from any such dealings that it be shown affirmatively that he acted in perfect good faith and took no advantage of his influence or knowledge and that whatever contracts he made were fair, adequate and equitable. If no such proof is established courts of equity will void the contracts on the ground of constructive fraud." The court did not err in overruling the demurrer.

Appellants contend that the depositions filed on behalf of the appellee commencing on page 65 and ending on page 121 of the record, were improperly made a part of the record because of certain irregularities mentioned and that the same were not properly authenticated; that "the certificate thereto appended is an essential part of it and must be made by the officer who took the depositions." And cites in support of this exception Hogg's Eq. Pr. 567, section 490, and chapter 130, section 33 of the Code. It does not appear that any exceptions were taken in the court below to the reading of the depositions on account of the irregularities mentioned, and the objection cannot be raised for the first time in the appellate court. Section 6, chapter 135, Code, giving directions how records shall be made up in chancery causes appealed to the supreme court of appeals provides that "Notices to take depositions, the captions to such depositions, and certificates of their having been sworn to, except so far as may be necessary to the decision of the exceptions taken to the

reading of the depositions" shall not be copied into the record.

The assignment that the court erred in cancelling and annulling and setting aside the said deed of trust or contract dated October 30, 1899, and decreeing costs against the defendant Cheuvront. The action of the court in thus ruling is based upon the proofs going to the merits of the case. Plaintiff testified that Horner and his wife came to her with some papers and requested her to sign them, with the assurance that the defendant Cheuvront would come to Parkersburg and live with her and take her out of the boarding house and maintain her; that Horner had some money in his hand; that they made her believe that Cheuvront wanted to come and live with her and said he wanted to have the suit dismissed before he came to her; that Horner said that Scott Stuart and Charles Cheuvront were always dunning him for money and he wanted to get away from them and come to Parkersburg where he would be free from these two parties; that Scott Stuart was building a new house and always wanted money from him and Charles Cheuvront always wanted money from him; that Horner had a paper that he said he had made out himself; nobody knew anything about it but he and Mr. Cheuvront. Mr. Horner went out "and came back with the notary public, and they talked on to me and pursuaded me to sign that certain paper, said it did not amount to anything. I did not read it and did not know anything it contained. Mr. Horner pretended to read it but I don't think he read more than two or three pages and read so low I did not hear it." And states that she did not know the contents of the paper until about the first of December; that she signed the paper and Horner gave her $400.00. She states that she did not know that Cheuvront had given Horner $750 to give to her until she met defendant at Pennsboro about the 19th or 20th of November, when defendant told her what he had given him. James H. Leonard, the notary public who took the acknowledgment of Mrs. Cheuvront to said contract, says, on the 31st of October, 1899, Horner told him he wanted him to take an acknowledgment, he asked where the party and papers were and he said they were not ready for some time yet. Witness was just about to eat his supper, which he did and came back down when Horner said he would go after the party, when witness said he had an engagement at his office at seven o'clock and didn't know

how long it would take him to get through; that Mrs. Horner spoke up and said, "I will give you more than you can make," and laughed, and she said "I will give you $5 if you will take the acknowledgment;" that witness went down and came back a little before eight o'clock and met Mr. Horner, they went down to Mrs. Cheuvront's and went in to the parlor. Mr. Horner and Mrs. Horner were there and Horner introduced him, saying he was an attorney. Witness said he was not an attorney, but a notary public; that Horner had been telling him something about the case but mentioned no names, calling them a woman and an old man who were separated and they were trying to get them back together. He says here's the paper and handed it to me and says you read it over and see if you think it is doing her any harm to sign it. Witness says he read it over and told her he was not an attorney but from what they said they were after, to get them back together, he thought it was the best thing to do, to get them together, "not to fight divorce cases as there was no pay in it," she did not know whether to sign it or not and Mr. Horner introduced the subject and commenced laughing and said the last words the old man said was if it was fixed up he would come in right away to live with her, and made some remark about getting peace, or something like that, and everybody laughed, and she said she did not know whether to sign it or not. I took my hat and says 'well use your own judgment about signing it. I says I am here to take the acknowledgment if you want to sign it', and she said 'Mr. Horner do you think he will be here' and he says 'Yes as soon as you sign the paper I will go right down and telephone and he will come in on the first train.' " She signed the paper after a little discussion. Horner asked me what my fees were and I said 'What you promised me, $5' and they handed it to me and that was all that occurred at that time. Witness was asked what, if anything, was said by Horner and Mrs. Cheuvront about Joseph Cheuvront coming in to live with her. He answered, that Horner had some papers which he held up and showed to her claiming that her lawyers had been false to her and had not been fair with her and that it was worrying the old man, and that he would have been in long before but for her lawyers, and that he had been crying around in the store and calling her his lovey-love, and that he had got tired of it and wanted to get them fixed up, and that he would

come and had promised to come in as soon as the papers were signed; that she asked Horner if he was coming in to live with her and he said 'Uncle Joe had been telling all along about his troubles and that he was coming in to live with her; that several weeks afterwards witness saw Joseph Cheuvront at the train, which was about a half hour late that evening; he said as soon as he got things fixed up he would come in "and he commenced crying and said for me not to believe all that Bill Horner said, that he was always talking; that he had always been true to Mrs. Cheuvront; that he had heard reports but didn't believe them, and Horner came up then and commenced running down some lawyers out there that Mrs. Cheuvront had employed and commenced telling him about the time they would have Christmas and during holidays; that he would be here at the time, or something to that effect.

It was proved by John F. Laird, Prosecuting Attorney of Wood County, that Horner procured himself and his wife to be summoned before the grand jury of Wood County in January, 1900, and by J. M. Thayer that Horner sent him to Mrs. Cheuvront's to tell her that he and his wife were summoned before the grand jury and if she did not withdraw some suit at once between her and some man, he believes he was Mr. Cheuvront, that he would have to indict her, if she would withdraw the suit he would not go before the grand jury to indict her; that he had the summons with him and left them with Mrs. Cheuvront. These were the summons served on Horner and his wife to appear before the grand jury and filed with plaintiff's depositions. Witness stated that he was in the employ of Horner at the time and that Horner sent her word by him that he would indict her unless she dismissed that suit; that Horner gave him the copy of the subpoena for himself and his wife and said "Maybe she won't believe you and think we are working up a scheme." Says Horner told him he got $500.00 for making a compromise that was made between them, and that Joseph Cheuvront paid it to him.

Plaintiff filed with her own depositions a copy of the original receipt as follows:—"Received of Joseph Cheuvront, by the hands of W. S. Stuart, the sum of Seven Hundred and Fifty Dollars, ($750.00) to be used by me in a compromise between said Joseph Cheuvront, and to be paid to Mrs. Elizabeth

Cheuvront in case she signs a certain deed, prepared by the said Stuart, which sum I guarantee to be returned to the said Cheuvront in case same should be lost or any accident to same, if not paid to the said Elizabeth Cheuvront, upon said compromise upon her executing said deed.

This October 31st, 1899.                         W. J. Horner."

Which copy of receipt she received enclosed in a letter from her husband dated December 1. Much of the correspondence between the parties before and after the making of said contract of October 30, 1899, is filed as exhibits with depositions. Nearly all of said letters contain expressions of affection and love for each other. On the 22d day of November, 1899, about the next day after they parted at Pennsboro defendant wrote quite a lengthy letter, closing by saying that he never eat an apple but he thought of her and how they enjoyed themselves together at Pennsboro, that it was almost a heaven on earth for him to be with her and to get along so pleasant together; that he wanted no other company while there "But you and you only my dear wife I wish I could see you this evening but cannot, so good bye, God bless and pray for me that we may call to die be fully prepared to meet one another. I ever remain your husband affectionately, J. C."

All of defendant's letters to the plaintiff, until the last one or two in December, were calculated to inspire the plaintiff with the hope that defendant would be reconciled to her and that they would again be re-united and all her letters to him that are filed with his depositions indicate that she thought they were to again live together. He files one letter from plaintiff to himself dated November 26, 1899, nearly a month after the contract was made addressed "My Dear Husband" and closing with "Your last letter was so nice, it was so comforting for me to be called your dear wife, it makes me feel like I was in heaven to be loved again by the only one I love on earth ......... I will not worry you by writing any more now. I hope you will come to see me soon, 'papa'."

Your affectionate wife.
L. C."

The depositions giving the conversations between Horner *et al.* in the absence of the defendant in getting the paper signed

are objected to because of the absence of the defendant, but the evidence strongly tends to establish the fact that Horner was the agent of the defendant in making the compromise and procuring the execution of the deed or contract by the plaintiff, and the court was warranted in so holding. A very strong element of proof that plaintiff did not know, as positively stated by her in her testimony, the contents of the paper which she signed was the fact that she accepted the $400.00 and said nothing about the $750.00, which if she had read or examined the contract as it was claimed she did, she must have known that she was getting but little over half of the amount for which she was acknowledging receipt. In *Way* v. *Life Ins. Co.,* 39 S. E. 742, (syl. pt. 1), the supreme court of South Carolina holds: "Where a husband entered into a contract with his wife by which he or his estate obtained an advantage over her, the burden of proof is on the husband, or the representatives of the husband, to show that the wife was fully informed as to the effects of the transaction, and also the utmsot fairness therein."

The questions on the merits of the case resting, as it does, wholly upon the evidence, and the circuit court having found that the allegations of the bill were sustained by the proofs and the evidence appearing sufficient to warrant the decree the same will not be disturbed, and the decree must be affirmed.

*Affirmed.*