# Harton *v.* Little, *et al.*

### Bill to Rescind and Cancel a Deed.

(Decided May 21, 1914.    Rehearing denied June 18, 1914.
65 South. 951.)

1. *Equity; Right to Relief; Clean Hands.*—It is sufficient to establish that complainant is not entitled to equitable relief because he does not come into equity with clean hands if it appears that complainant has been guilty of unscrupulous practice or overreaching, or has concealed important facts, though not actually fraudulent, or has been guilty of trickery, or taking undue advantage of his position, or unconscientious conduct.

2. *Same.*—The facts examined and it is held that although in the first instance complainant was under no duty to disclose his option, yet such duty devolved upon him when he became a quasi partner of defendant in the purchase, and not having performed his duty, was not entitled to equitable relief against respondent by virtue of the maxim that "he who comes into equity must come with clean hands."

APPEAL from Jefferson Chancery Court.
Heard before Hon. A. H. BENNERS.

Bill by H. M. Harton against W. M. Little and others, to rescind and cancel a deed to certain bonds, and to have a deed executed to complainant. Decree for respondents and complainants appeal. Affirmed.

See, also, in this connection *Harton v. Little,* 176 Ala 267, 57 South. 851; *Harton v. Enslen,* 176 Ala. 77, 57 South. 723; and *Empire R. Co. v. Harton,* 176 Ala. 99, 57 South. 763.

S. C. M. AMASON, for appellant. Counsel adopt practically the same brief as in the cases above set out.

FORNEY JOHNSTON and FRANK S. WHITE & SONS, for appellee. Counsel adopt practically the same brief as in the cases above set out.

GARDNER, J.—The demurrers to the bill as amended, which were sustained in the court below, seek to invoke (among others) the application of the principles embraced in the maxim, "He who comes into equity must come with clean hands."

In discussing the maxim, we can do no better than take a few excerpts from Mr. Pomeroy's excellent work (1 Eq. Jur. § 397 et seq.) wherein he says: "The maxim is sometimes expressed in the form, He that hath committed iniquity shall not have equity. Like the one described in the preceding section, it is not, in its ordinary operation and effect, the foundation and source of any equitable estate or interest, nor of any distinctive doctrine of the equity jurisprudence; it is rather a universal rule guiding and regulating the action of equity courts in their interposition on behalf of suitors for any and every purpose, and in their administration of any and every species of relief. Resembling the former maxim in this respect, it differs from that principle in some

most important and essential features.  In applying the maxim, 'He who seeks equity must do equity,' as a general rule regulating the action of courts, it is necessarily assumed that different equitable rights have arisen from the same subject-matter or transaction, some in favor of the plaintiff, and some of the defendant.  *   *   * The maxim does not assume that the plaintiff *has done* anything unconscientious or inequitable.   *   *   * On the other hand, the maxim, now under consideration, 'He who comes into equity must come with clean hands,' is much more efficient and restrictive in its operation. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him *all* recognition and relief with reference to the subject-matter or transaction in question.  It says that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some relief, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.   The principle involved in this maxim is merely the expression of one of the elementary and fundamental conceptions of equity jurisprudence.   *   *   * Whatever may be the strictly accurate theory concerning the nature of equitable interference, the principle was established from the earliest days that, while the court of chancery could interpose and compel a defendant to comply with the dictates of conscience and good faith with regard to matters outside of the strict rules of the law, or even in contradiction to those rules, while it could act *upon the conscience* of a defendant and force him to do right and justice, it would never thus interfere on behalf of a

plaintiff whose own conduct in connection with the same matter or transaction had been unconscientious or unjust, or marked by a want of good faith, or had violated any of the principles of equity and righteous dealing which it is the purpose of the jurisdiction to sustain. While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties, who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies."

The author then in the following section, by way of illustration, points out the effect of the above maxim upon cases involving specific performance, and shows that, although a contract may be perfectly valid and binding at law, and may be of a class which brings it within the equitable jurisdiction, because the legal remedy is inadequate, yet if the plaintiff's conduct in obtaining it, or in acting under it, has been unconscientious, inequitable, or characterized by bad faith, a court of equity will refuse him the remedy.

"By virtue of this principle, a specific performance will always be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, even though not actually fraudulent, by trickery, by taking undue advantage of his position, or by any other means which are unconscientious. * * * This application of the principle, better perhaps than any other, illustrates its full meaning and effect for it is assumed that the contract is not illegal, that no defense could be set up against it at law, and even that it possesses no features or incidents which could authorize a court of equity to set it aside and cancel it. Specific performance is

refused simply because the plaintiff does not come into court with clean hands."

As is shown in the recent case of *Baird v. Howison,* 154 Ala. 366, 45 South. 670, this maxim includes within its operation several others, frequently acted upon in courts of equity, among them being the following: No action arises out of fraud or deceit; a right cannot arise to any one out of his own wrong. When both parties are equally in the wrong the defendant holds the stronger ground; and, as there quoted: "The fundamental reason upon which each of these maxims seems to rest is that a party does not come into court with clean hands to whose cause either of these maxims may be justly applied."

In *Glover, Adm'r, v. Walker,* 107 Ala. 540, 18 South. 251, quoting the case of *Williams v. Higgins,* 69 Ala. 523, we find the following: "Truth and fair dealing are rules of universal obligation. If men, in consummation of frauds, employ instruments, binding and conclusive in their legal operation and effect, it is sound reason, good policy, sheer justice, to leave them where they have placed themselves, bound as they have bound themselves, without assistance from the courts to unloose them, when it becomes their interest to be unloosed, encouraging them and others to commit similar fraud."

It is also made clear by the authorities that the principle is not invoked out of any regard or concern for the adverse party, but more in reproof to the plaintiff, and by way of punishment for the wrong and condemnation thereof by the court. This is better expressed in quotation found in *Baird v. Howison, supra,* as follows: "The principle or policy of the law, therefore, is to reject the suit of and reprove the plaintiff for his wrong —not to reward the defendant. The plaintiff must be punished, even though it may be at the expense of allow-

ing the defendant, an equally guilty party, to obtain most unjust and unfair advantage for himself."

And in *Glover v. Walker, supra,* it is said: "It is held that, where the purpose of a grantor in the execution of a conveyance, absolute in form, is to place his property beyond the reach of creditors, to be held in trust for his own benefit, neither he nor his heirs can enforce the trust; not that such a conveyance gives the grantee an honest right to hold, but, because of the *vicious intent* (italics ours) of the grantor, he forfeits all right to enforce the trust."

It but remains to apply the principles above stated to the case in hand. We make no effort to here state all the material averments of the bill, but only call attention to a few which seem of most importance.

The complainant alleges that in January, 1900, he obtained an option on 150 acres of land located near Woodlawn, and which is now a part of the city of Birmingham, Ala., for purchase price of $25 per acre; that soon thereafter he was introduced to one W. M. Little either by James F. Johnston or R. D. Johnston; that Little informed him of his desire to invest in real estate, whereupon complainant told him of the said land, but did not tell him he had an option thereon, and offered to sell Little same at $50 per acre; that he took Little to see the land and said Little stated he did not want to go in debt and had only enough money to pay for one-half of it at the purchase price of $50 per acre; that Little left Birmingham that day for North Carolina.

It is further averred that complainant then proposed to said Little that they go and see R. D. Johnston, and, if said Johnston would take a one-half interest in said land with him, then he (complainant) would do so; that they saw said R. D. Johnston, who declined to purchase one-half interest with Little; but that he (Johnston)

said, if complainant would purchase the one-half interest in it with Little, that he would lend complainant $500 to pay on the one-half interest, provided complainant would have the title to the one-half interest conveyed to him (R. D. Johnston) as security for the loan.

It is then alleged that W. M. Little and R. D. Johnston then agreed that complainant and Little should purchase the land, one-half interest each, and that it should be conveyed by deed to James F. Johnston, as trustee, for complainant and said Little. It appears that the conveyance was made accordingly; that Little paid his $500 and subsequently paid the balance in cash, and that his payments paid in full for the land as the real purchase price to the owners was only $25 per acre. Pursuant, however, to the understanding and agreement of the parties, R. D. Johnston gave complainant a check for $500, which is alleged was a loan; but complainant did not use the check in making the purchase, and did not return it to R. D. Johnston, "leaving it among papers in reference to the purchase of said tract of land."

It thus appears that at the beginning of the negotiations complainant was to sell and at their conclusion he was (so far as Little knew or understood) a copurchaser with Little of said lands. Little had declined to buy as proposed by complainant; but he consented to buy *with* complainant, each acquiring a one-half interest. He knew nothing of the option. The check from Johnston to complainant appears to have been for the express purpose of deceiving Little, which check, it is alleged, was "left among the papers," neither used nor returned.

It is insisted that complainant was under no duty to disclose the fact of his option and the price. If it be conceded that he was under no such duty in the beginning of the negotiations, we do not think it helps complainant's case materially. When the whole matter was

concluded, complainant was a *copurchaser* with Little.
The latter so understood, and all that was done appears
to have been with intent of keeping Little in the dark
as to the true situation, and to deceive and mislead him.

For a court of equity to deny relief for misconduct
on the part of complainant, it is not essential that the
fraud or deceit be such as would be a defense to an ac-
tion at law, or even that it should be such as would re-
quire a court of equity to cancel the contract, as ap-
pears from quotation herein quoted from section 400,
Pom. Eq. Jur. vol. 1.

If he has nevertheless been guilty of unscrupulous
practices, or overreaching, or has concealed important
facts, even though not actually fraudulent, or been
guilty of trickery, or taking undue advantage of his po-
sition, or other unconscientious conduct, then a court
of equity may deny relief, although such may not con-
stitute a defense at law.

The bill as much as confesses a willful premeditated
deceit practiced on Little, whereby complainant, a co-
purchaser with Little, procures the latter to pay the full
purchase price. As copurchasers they occupied a posi-
tion akin to a quasi partnership, and, whether complain-
ant, in the beginning, was under any duty to disclose
the true situation or not, clearly when the latter rela-
tionship was formed, he was not in a position to perpe-
trate upon him a positive deceit. To grant the relief
here sought would be to strike down the maxim, "No
right of action arises out of fraud or deceit," and that
other that "a right cannot arise to any one out of his
own wrong." To so grant relief would be, at least by
implication, to approve the conduct of the complainant,
and this a court of equity cannot do. Speaking to
that maxim, the Ohio Supreme Court, in case of *Kin-
ner v. Lake Shore & M. S. Ry. Co.,* 69 Ohio St. 339, 69

N. E. 614, says: "It denies all relief to a suitor, however well founded his claim to equitable relief may otherwise be, if, in granting the relief which he seeks, the court would be required, *by implication even,* to affirm the validity of an unlawful agreement, or *give its approval* to *inequitable conduct* on his part." (Italics ours.)

Whether such deceit be sufficient to avoid a contract either at law or in equity is immaterial. The evil motive, the trickery, the overreaching, the inequitable and unconscientious conduct are sufficient to preclude complainant from relief. It may be that some advanced ideas of a progressive age might condone such practices as "shrewd business"; but a court of equity is a court of conscience, demanding of those who seek relief at its hands just and equitable conduct, and recognizing truth and fair dealing as a rule of universal obligation, and whenever one has violated conscience or good faith and seeks its aid, then its doors are shut against him. It demands that "he who comes into equity must come with clean hands."

It has been held by this court, in *Baird v. Howison, supra,* that where a party resorts to equity to enforce a right growing out of a contract fraudulent and void, as to which the parties are in pari delicto, the court will deny the relief when the fraud is discovered from the evidence, *whether specially pleaded or not.*

Nor have we stated all of the inequitable conduct of complainant as shown by the bill. It is shown that R. D. Johnston proposed to complanant (this about two years after the purchase) that James F. Johnston convey a one-half interest in the land to Little and a one-half interest in the land to his wife, Lizzie Johnston; each deed reciting consideration of $4,000. This was done November 19, 1901. Thereupon R. D. John-

[Harton v. Little, et al.]

ston proposed to complainant that said Lizzie Johnston execute a deed to one-half interest in said land to complainant, and that complainant then executed a mortgage on same to Lizzie Johnston, purporting to be security for the purchase price of said one-half interest, in order to enable him (R. D. Johnston) to borrow some money to pay debts he owed. Complainant consented thereto. The deed was made to Lula Harton, wife of complainant, and recited consideration of $5,000. The mortgage was then executed by Lula Harton and complainant, reciting a consideration of $3,000. This mortgage afterwards fell into the hands of one Gilmore, was foreclosed, etc., and some of defendants seem to have acquired the title it purports to convey.

It thus appears that by consent and acquiescence of complainant the title was placed in his wife, and that he joined his wife in a mortgage reciting a consideration of $3,000, which was fictitious and false, and this for the purpose of enabling Johnston to borrow money on the strength of the same. Again the evil intent, the fraudulent design, its present. But we do not think a further discussion necessary or profitable.

Complainant seeks the aid of a court of equity, and if, by his conduct as herein shown, he has placed himself outside the pale of truth and fair dealing in regard to this transaction, then it must be admitted that it is sound reason, good policy, and sheer justice to leave him where he has placed himself, "bound as he has bound himself, without assistance from the courts to unloose him."

We are not unmindful that the general principles of law herein stated have their limitations. They are noted and commented upon in *Phillips v. Bradford*, 147 Ala. 346, 41 South. 657, and in section 403, Pom. Eq. Jur. vol. 1. One of such limitations to the general rule is

where the parties are not in pari delicto, as where a stronger mind takes advantage of a weaker, etc.

We are unable, however, to find in the record any room for application of any of these limitations. While the bill does show a confinement of complainant in the asylum for the insane, yet this did not occur until January, 1905, long after the above-stated transaction; and the bill further shows that he had never been afflicted with any mental disease, nor had there even been a taint of insanity in any of his ancestors or relatives. It would therefore appear from the bill that at the time of the transactions herein referred to complainant was in the vigor of physical and mental strength.

We are of the opinion that the demurrers to the bill as amended were properly sustained, and the decree of the chancellor is affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.