WILLIAM M. DALE, *Appellant,* v. WILLIAM JENNINGS, *Appellee.*

En Banc.

Opinion Filed July 27, 1925.

Petition for Rehearing Granted September 26, 1925.

Decree Re-affirmed January 14, 1926.

1.  It is the duty of those dealing in a fiduciary or confidential capacity to disclose all essential or material facts pertinent or material to the transaction in hand.

2.  The term "fiduciary or confidential relation" as used in the law relative to undue influence, is a very broad one. It has been said that is exists, and that relief is granted, in all cases in which influence has been acquired and abused—in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another.

3.  Principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to

feter this useful jurisdiction by defining the exact limits of its exercise.

4. Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed.

5. Each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances.

6. A confidential relation exists when confidence is reposed by one party and a trust accepted by the other, when a confidence has been imposed and betrayed, or when influence has been acquired and abused. It embraces both technical and fiduciary relations and those informal relations where one man trusts in and relies on another.

7. The fact of invited confidence necessarily carries with it the superlative degree of frankness and square dealing. Any standard of business ethics below this would be disastrous and distructive to our commercial institutions and square in the teeth of every principle of our system of equity jurisprudence.

8. The doctrine of clean hands is confined to misconduct in the matter in litigation and must concern the opposite party. It has no application to wrongs committed at large.

9. In order to establish that complainant is not entitled to equitable relief because he does not come into equity with clean hands, it is not essential that the fraud or deceit be such as would be a defense to an action at law, or as would require a court of equity to cancel the contract; but it is

sufficient if it appears that complainant has been guilty of unscrupulous practices, or overreaching, or has concealed important facts, though not actually fraudulent, or has been guilty of trickery, or taking undue advantage of his position, or unconscientious conduct.

10. A court of equity will not decree the specific performance of a contract unless it is strictly equitable, and free from trickery and deception on the part of the party seeking such performance. Even if the inequity of the plaintiff is insufficient to warrant the court in canceling the contract, yet the plaintiff may be refused its enforcement. And equity will refuse its aid in the enforcement of a contract where the plaintiff has been guilty of unconsciousable conduct which does not amount to legal fraud.

11. The doctrine of clean hands need not be pleaded to be available, but where the evidence discloses the unconsciousable character of the transaction, equity will of its own motion apply the maxim and deny relief.

12. The suggestion that the plaintiff has no remedy at law or any legal relief against the defendant argues nothing against the right and the duty of a court of equity to refuse to grant aid to a party as to a transaction which has been brought into existance solely by the fraud practiced by him upon the party against whom he seeks relief as to said transaction, a court of equity in the administration of its principles does not concern itself about what may or may not be done in another forum.

13. One who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law.

Judgment affirmed.

*Robert E. Davis* and *Cooper, Cooper & Osborne,* for Appellant;

*E. H. Martin* and *George C. Bedell,* for Appellee.

TERRELL, J.—William M. Dale filed his bill in chancery in the Circuit Court of Alachua County, Florida, against Wiliam Jennings, seeking to enforce a vendor's lien upon certain real and personal property in Alachua and other counties in this State, or in lieu of such lien to require Jennings to execute in favor of Dale a certain promissory note secured by a mortgage on said property.

The bill was filed January 22, 1920, and alleges the agreement to sell and convey the property therein described to Jennings for $750,000.00, the terms of sale to be $400.000.00 cash and the balance of $350,000.00 to be represented by a promissory note executed by Jennings in favor of Dale payable in five years from date, bearing interest at six per cent. payable semi-annually, and to be secured by a mortgage on the property sold and more specifically described in the bill.

The bill also alleges that on December 19, 1919, Dale and wife executed and delivered to Jennings said deed, and that Jennings paid Dale the said sum of $400,000.00 in cash, and that Jennings has failed and refused and still refuses to make, execute and deliver the said promissory note and mortgage. The bill describes in full the properties and improvements thereon, and charges that Jennings has taken possession of and intends to begin mining and operating the property.

The bill prays for an accounting, and that Jennings be required to execute the note and mortgage and that Dale be decreed to have a lien on all the property described in the deed for the balance of the purchase money, and for injunction and receiver.

To the bill of complaint answer was duly filed, in which was included a cross-bill. The answer admits the execution of the deed by Dale and wife to Jennings, but denies the right of Dale to the note and mortgage because business

relations had been established between Dale and Jennings in reference to the sale of said property and that the $350,000.00 was a profit accruing from said business relations or joint enterprise. The answer in great detail outlines the circumstances in reference to the business relations of Dale and Jennings in regard to the subject-matter in litigation, and denies the right of Dale to the note and mortgage for $350,000.00 as the balance of the purchase price, or to have or hold any lien on said property for said amount.

The answer was tested by exceptions and motion to strike, which were in the main sustained by order of the court dated July 20, 1920. An amended answer was filed which was also tested by exceptions and motion to strike, which were in the main overruled by order of the court dated July 20, 1921, and the amended answer allowed to stand as a defense. Special replication was duly filed to the amended answer. A master was appointed who took and reported all the testimony, and on final hearing the court entered his decree August 20, 1923, in favor of Jennings, and dismissing the bill of complaint. Appeal is taken from the final decree.

This case presents for our consideration two questions of law which may be stated as follows: (1) Has appellant Dale entered a court of conscience with clean hands, and (2) Do the facts as here presented show a confidential relation to have existed between Dale and Jennings at the time of the transaction in question?

The basis of this litigation is a contract embraced in numerous letters and telegrams which passed between Dale and Jennings. The record shows that Dale and Jeninngs had been acquaintances for many years, during which time they had transacted much business, Dale as the representative of the Dutton Phosphate Company, and Jennings as the representative of Stead and Temple, the

European agents of Dutton Phosphate Company. Jennings was a citizen of London, England, and had often extended courtesies to representatives of Dutton Phosphate Company during their visits to Europe, while he (Jennings) had in turn been entertained in the home of Dale when visiting this country, all of which took place over a period of years prior to the World War.

The record further shows that Jennings was incarcerated as a civilian prisoner of war by the Germans during the World War, that immediately following his release from prison, that is to say, on November 29, 1918, he wrote Dale a letter seeking to renew business relations by acquiring the European selling agency for Dutton Phosphate Company, and proposing to work under a "Selling Agency Limited" with capital stock of £10,000.00, one half of which was to be owned by associates in Europe and the other half by Dutton Phosphate Company in this country. On receipt of this letter Dale wrote Jennings that the Dutton Phosphate Company had been succeeded by Alachua Phosphate Company with him (Dale) as president; that the new company had suspended mining operations and did not expect to resume mining, but would like to sell their properties; that they were open to an offer of purchase and could show a good proposition out of which considerable money could be made; that he (Dale) was in position to give any information that might be wanted with reference to the matter, would entertain a proposition to carry on the business in this country, and that by reason of his very large experience in the prosphate business he was in posession of valuable information about it which would be useful to him as manager and miner.

At this juncture Jennings took the matter up with the Produce Brokers Company of London, England, a prospectus of the properties was prepared from information furnished by Dale, and after a lengthy correspondence and

two visits by Jennings to Dale in which Jennings was a guest in the home of Dale, an agreement was reached for the purchase of the property on the part of Produce Brokers Company for the sum of $750,000.00. In connection with the agreement to purchase Jennings requested Dale to make his company a proposition for salary to manage the affairs of the business on this side. After making some suggestions with reference to matters of policy, in connection with the business, Dale replied as follows:

"Should this course be pursued, I am in position to insure you up-to-date, efficient, accurate and prompt service, being myself very thorough in accountancy, besides my thorough knowledge of the phosphate business from every angle would insure you every efficiency, and my close attention to the affairs of my employer never has been, nor ever will be questioned. * * * I will accept the position at $10,000.00 per annum, monthly payments, for the first year."

Dale's proposition to manage the property on this side was promptly accepted, and Jennings left London at once for Gainesvile, arriving there December 12, 1919, at four o'clock in the morning; he was met by Dale who carried him to his (Dale's) home, where he remained a guest until early in January. Negotiations between Dale and Jennings looking to purchase were started early in 1919. On September 12, 1919, Dale secured an option from the Alachua Phosphate Company to purchase all their assets, said assets being the identical property involved in this litigation, for the sum of $400,000.00 cash, out of which Dale was to have a commission of $10,000.00 provided the option was exercised and the money paid by January 31, 1920. Notwithstanding this option, in reply to a request on the part of Jennings dated early in October, 1920, for a three-months' option Dale replied in effect that it would be dif-

ficult to obtain, the delay was dangerous and that it was a great bargain.

Soon after the arrival of Jennings in this country, or about the middle of December, 1919, Dale offered to divide his commission of $10,000.00 with him, but Jennings refused to accept unless his employer Produce Brokers Company could be given credit for that amount. Dale would not consent to this. On the 18th of December, 1919, Jennings advised Dale that he had perfected financial arrangements and was ready to close the transaction. Dale presented his deed to Jennings for the properties. Jennings had expected the deed to come from Alachua Phosphate Company, but after seeing deed from said Company to Dale, turned over draft for $400,000.00 as the cash payment. The source of the deed, the failure of Alachua Phosphate Company to transfer its stock and abstracts to Produce Brokers Company, and the deception by Dale with reference to his commission, and other matters, precipitated the breach between Jennings and Dale; hence the refusal of Jennings to execute the note and mortgage for $350,000.00.

Stated briefly on careful analysis of the whole record one is impressed with the fact that Jennings approached Dale in good faith and confidence; that throughout the entire transaction covering a period of more than a year he (Jennings) relied implicitly on Dale's statements and judgment with reference to the transaction, and that such reliance and confidence was not only invited by Dale but was based on many years' acquaintance and his belief in him as a man of business capacity and commercial integrity. Dale accepted all these expressions of trust and good faith on the part of Jennings, but deceived him with reference to the option, his commission, his representative capacity and other matters of minor importance not necessary to enumerate here.

I think the record clearly shows a fiduciary or confidential relation existing between Dale and Jennings, and that it was the duty of Dale to disclose the truth with reference to his option, his cómmission, his. representative capacity and all other facts material to the transaction. His failure to do this was a fraudulent concealment from Jennings of information that he was entitled to.

The term "fiduciary or confidential relation," as used in the law relative to undue influence, is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused —in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. Stahl v. Stahl, 73 N. E. 319-321, 214 Ill. 131, 68 L. R. A. 617, 105 Am. St. Rep. 101, 2 Ann. Cas. 774; Irwin v. Sample, 72 N. E. 687, 690, 213 Ill. 160 (quoting and adopting definition in 2 Pom. Eq. Jur. § § 947, 956)'' 2 Words and Phrases (2nd Series) p. 529.

Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation as a fact exists in which confidence is reposed on one side and there is resulting superiority and influence on the other, and the relation and duties involved in it need not be legal, but may be moral, social, domestic or merely personal. Hensan v. Cooksey, 237 Ill. 620, 86. N. E. Rep. 1107; Beach v. Wilton, 244 Ill. 413, 91 N. E. Rep. 492; Beare v. Wright, 14 N. D. 26, 103 N. W. Rep. 632, 69 L. R. A. 409; 2 Pomeroy's Eq. Juris. (4th ed.) § 956.

The rule as to disclosure by those in fiduciary relations has been well stated in Tate v. Williamson, 2 Law Reports, Chancery Appeal Cases, p. 55, text 60 and 61, where the court said:

"The jurisdiction exercised by Courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the Courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed.

See also Tate v. Williamson, 1 L. R. Eq. Cas. 528, text 536; Keith v. Kellam, 35 Fed Rep. 243; Cheuvront v. Cheuvront, 54 W. Va. 171, 46 S. E. Rep. 233; Stuart v. Hauser, 9 Idaho 53, 72 Pac. Rep. 749; Ewing v. Ewing, 33 Okla. 414, 126 Pac. Rep. 811; Branch v. Buckley, 109 Va. 784, 65 S. E. Rep. 652; Bacon v. Soule, 19 Cal. App. 428, 126 Pac. Rep. 384; Salhinger v. Salhinger, 56 Wash. 134, 105 Pac. Rep. 236; 2 Pomeroy's Eq. Juris. (4th ed.) §§ 955, 956.

Section 902, Pomeroy's Equity Jurisprudence (4th ed.), Volume 2, says that all instances in which it becomes the duty of the party having knowledge to disclose may be divided into three classes. The second class covers the case at bar and is as follows:

"The second class embraces those instances in which there is no existing special fiduciary relation between the parties, and the transaction is not in its essential nature fiduciary, but if it appears that either one or each of the parties, in entering into the contract or other transaction, *expressly* reposes a trust and confidence in the other; or else from the circumstances of the case, the nature of their dealings, or their position towards each other, such a trust and confidence in the particular case is *necessarily* implied. The nature of the transaction is not the test in this class. Each case must depend upon its own circumstances. The trust and confidence, and the consequent duty to disclose, may expressly appear by the very language of the parties, or they may be necessarily implied from their acts and other circumstances."

Hadley v. Clinton County Importing Co., 13 Ohio St., 502, 82 Am. Dec. 454; Schiffer v. Dietz, 83 N. Y. 300; Brown v. Montgomery, 20 N. Y. 287; Bank of Republic v. Baxter, 31 Vt. 101.

A confidential relation exists when confidence is reposed by one party and a trust accepted by the other, when a confidence has been imposed and betrayed, or when influence has been acquired and abused. It embraces both technical and fiduciary relations and those informal relations where one man trusts in and relies on another. Mayrand v. Mayrand, 194 Ill. 45, text 48, 61 N. E. Rep. 1040; Beach v. Wilton, *supra*; 14 Am. & Eng. Ency. Law (2nd ed.) 69, 70; Zimmerman v. Bitner, 79 Md. 115, 28 Atl. Rep. 820; Dickerman v. Northern Trust Co., 176 U. S. 181, text 203, 20 Sup. Ct. Rep. 311; Loudenslager v. Woodbury Heights Land Co., 58 N. J. Eq. 556, 43 Atl. Rep. 671.

The record here discloses that Jennings was an English subject recently released from a German prison; that he wrote Dale, his old friend and in whose business integrity he had great confidence, with the purpose of securing em-

ployment; that Dale proposed a sale; that Jennings got
the Produce Brokers Company interested, and the terms
of sale were agreed on.   Jennings relied implicitly on Dale
because of broad knowledge of the phosphate business and
because of his business integrity.   Dale deceived Jennings
as to the option, but accepted employment under him at a
salary of $10,000.00 per annum, pretended to be repre-
senting the Alachua Phosphate Company, when he was
representing himself, and led him (Jennings) to believe
that the $750,000.00 was the amount exacted by the
Alachua Phosphate Company for the property when in
fact $350,000.00 of this amount was profit for Dale.   In
such conduct he concealed from Jennings facts that he was
in law required to reveal, so he has no standing in a court
of equity.

The foregoing argument as to this case necessarily con-
cludes the question of clean hands.   From the inception
of the transaction Jennings reposed a confidence in Dale
that was invited both in deed and language.   They at no
time dealt at arm's length, and the fact of invited confi-
dence necessarily carries with it the superlative degree of
frankness and square dealing.   Any standard of business
ethics below this would be disastrous and destructive to our
commercial institutions and square in the teeth of every
principle of our system of equity jurisprudence.

The doctrine of clean hands is confined to misconduct
in the matter in litigation and must concern the opposite
party.   It has no application to wrongs committed at
large.   Miller v. Berry, 78 Fla. 98, 82 South. Rep. 764;
York v. Searles, 97 App. Div. (N. Y.) 90 N. Y. Supp. 37;
Brown v. Brown, 66 Conn. 493, 34 Atl. Rep. 490; C. F.
Simmons Medicine Co. v. Mansfield Drug Co., 93 Tenn.
84, 23 S. W. Rep. 165.

"In order to establish that complainant is not entitled
to equitable relief because he does not come into equity

with clean hands, it is not essential that the fraud or deceit be such as would be a defense to an action at law, or as would require a court of equity to cancel the contract; but it is sufficient if it appears that complainant has been guilty of unscrupulous prectices, or overreaching, or has concealed important facts, though not actually fraudulent; or has been guilty of trickery, or taking undue advantage of his position, or unconscientious conduct.'' Harton v. Little, 188 Ala. 640, 65 South. Rep. 951; Weeghan v. Killefer, 215 Fed. Rep. 168; Bentley v. Tibbals, 223 Fed. Rep. 247; Kenyon v. Weissberg, 240 Fed. Rep. 536; Langley v. Devlin, 95 Wash. 171, 163 Pac. Rep. 395, 4 A. L. R. 32, text 44, and note.

In language pertinent to the subject-matter in litigation Eaton in his work on Equity at page 74, records the following on the subject of clean hands:

''The maxim applies not only to fraudulent and illegal transactions, but to any unrighteous, unconscientious, or oppressive conduct by one seeking equitable interference in his own behalf. A court of equity will not decree the specific performance of a contract unless it is strictly equitable, and free from trickery and deception on the part of the party seeking such performance. Even if the inequity of the plaintiff is insufficient to warrant the court in cancelling the contract, yet the plaintiff may be refused its enforcement. And equity will refuse its aid in the enforcement of a contract where the plaintiff has been guilty of unconscionable conduct which does not amount to legal fraud.''

Weegham v. Killefer, 215 Fed. Rep. 168, text 172; Langley v. Devlin, supra; 1 Pomeroy's Eq. Jur. (4th ed.) §§ 398, 400, 404.

It is proper to state in this connection that the doctrine of clean hands need not be pleaded to be available, but where the evidence discloses the unconscionable character

of the transaction, equity will of its own motion apply the maxim and deny relief. Bentley v. Tibbals, 223 Fed. Rep. 247; Harton v. Little, 188 Ala. 640, 65 South. Rep. 951; Creamer v. Bivert, 214 Mo. 473, 113 S. W. Rep. 1118; Langley v. Devlin, *supra*.

The suggestion that the plaintiff has no remedy at law or any legal relief against the defendant argues nothing against the right and duty of a court of equity to refuse to grant aid to a party as to a transaction which has been brought into existence solely by the fraud practiced by him upon the party against whom he seeks relief as to said transaction. A court of equity in the administration of its principles does not concern itself about what may or may not be done in another forum. Miller v. Kraus (Cal. App.), 155 Pac. Rep. 838; Note to Langley v. Devlin, *supra*.

Dale being the actor in the case at bar any wilful act on his part relating to the subject matter in litigation that would be condemned and declared wrongful by honest and fairminded men is sufficient to make his hands unclean. Courts and text-writers have repeatedly declared this to be the law, and that one who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, in justice or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly within the law. Weeghan v. Killefer, 215 Fed. Rep. 289, L. R. A. 1915A 820; Brown v. Brown, 66 Conn. 493, 34 Atl. Rep. 490; C. F. Simmons Medicine Co. v. Mansfield Drug Co., 93 Tenn. 84, 23 S. E. Rep. 165; Harton v. Little, *supra*.

For the reasons announced in this opinion the decree of the chancellor is hereby affirmed.

WEST, C. J., AND ELLIS AND BROWN, J. J., concur.

WHITFIELD, J., concurs in part.

STRUM, J., not participating.

WHITFIELD, J., concurring in part.

The misleading conduct of Dale had relation to the identity of the vendor rather than to the nature and values of the properties involved in the transactions. Fraud without injury is not remediable; (See 26 C. J. 1167; 25 C. J. 187); and fraud may be waived. 27 C. J. 22. Jennings took over the properties without seeking to rescind the purchase after he discovered the inequitable conduct of Dale. On the showing made, the identity of Jennings' vendor may be relatively immaterial, and Dale's conduct of no injury to Jennings, if the properties were of good title and were then of materially greater value than the amount of the first payment made to Dale. The price Dale agreed to pay his vendor for the properties may not be conclusive of their real value at the time of sale. Dale's conduct precludes specific performance in equity (Busch v. Baker, 79 Fla. 113, 83 South. Rep. 704), but it might not, under all the facts and circumstances of the transaction, exclude him from some relief upon due allegations and proofs of good titles and fair values for the properties that were actually received and kept and not fully paid for by Jennings after he discovered and complained of the misleading conduct of Dale. See Thompson v. Newell, 118 Mo. App. 405, 94 S. W. Rep. 557; Vlates v. Catsigianis (Mo. App.), 202 S. W. Rep. 441; 27 C. J. 100.

## ON REHEARING.

1. Where the members of the appellate court are equally divided in opinion as to whether a judgment, decree or order on appeal or writ of error should be reversed or affirmed, and there is

no prospect of a change of judicial opinion in the premises or of an immediate change in the *personnel* of the court, the judgment, decree or order should be affirmed, so that the litigation may not be unduly prolonged.

2. Where the members of the Supreme Court sitting six members in a body after full consultation are equally divided in opinion as to whether or not a judgment should be reversed, and there is no prospect of an immediate change in the *personnel* of the court, it becomes the duty of those who favor reversal to vote with those who favor affirmance and thereby affirm the judgment of the lower court. In such a case, while the judgment is a bar to another action for the same cause, yet, as no matters of law are decided so far as the questions upon which the court is equally divided are concerned, the judgment possesses no dignity or force as a judicial precedent as to such matters.

Decree affirmed.

*Robert E. Davis* and *Cooper, Cooper & Osborne,* for Appellant.

*Hocker & Martin* and *Geo. C. Bedell,* for Appellees.

## On Rehearing.

Per Curiam.—A rehearing having been granted herein and the record and arguments having been again fully considered, the Chief Justice, Mr. Justice ELLIS and Mr. Justice TERRELL are of the opinion that the decree appealed from should be affirmed pursuant to the first opinion filed herein, while Mr. Justice WHITFIELD, Mr. Justice STRUM and Mr. Justice BUFORD are of opinion that the decree should be reversed in part as indicated by the separate opinions filed herein; therefore, the decree will be affirmed so that the appeal may be disposed of.

Where the members of the appellate court are equally divided in opinion as to whether a judgment, decree or

order on appeal or writ of error should be reversed or affirmed, and there is no prospect of a change of judicial opinion in the premises or of an immediate change in the *personnel* of the court, the judgment, decree or order should be affirmed, so that the litigation may not be unduly prolonged.    Stubblefield v. Wilson, 88 Fla. 323, 102 South. Rep. 885; State *ex rel.* Amos v. Hamwey, 87 Fla. 55, 100 South. Rep. 796; Colman v. Macha, 87 Fla. 529, 100 South. Rep. 796.

Where the members of the Supreme Court sitting six members in a body after full consultation are equally divided in opinion as to whether or not a judgment should be reversed, and there is no prospect of an immediate change in the *personnel* of the court, it becomes the duty of those who favor reversal to vote with those who favor affirmance and thereby affirm the judgment of the lower court.    In such case while the judgment is a bar to another action for the same cause, yet, as no matters of law are decided so far as the questions upon which the court is equally divided are concerned, the judgment possesses no dignity or force as a judicial precedent as to such matters. State *ex rel.* Hampton v. McClung, 47 Fla. 224, text 225, 37 South. Rep. 5; 4 C. J. 1122; 2 R. C. L. 262; 3 Cyc. 405.

The decree appealed from is affirmed.

WHITFIELD, J., dissenting.

Mr. Justice STRUM, who did not participate in the former decision herein, now concurs in the separate opinion heretofore filed by the. writer and also joins in the view that as the Alachua Phosphate Company conveyed the legal title to the property to its president, Dale, who conveyed to Jennings and received part payment from Jennings, Dale should be decreed a lien for the balance of the value

of the property, which lien would inure to the benefit of the company if that be the equity in the premises.

STRUM, J., concurs.

BUFORD, J., dissenting.

Mr. Justice TERRELL has very clearly outlined the pleadings under which the issues were presented to the trial court and upon which final decree was entered in this cause. I am unable, however, to follow my esteemed associate in his conclusions.

Early in the year 1919 the appellant, then president of a private corporation, Alachua Phosphate Company, took up with the appellee the proposal of purchase and sale of the holdings of the corporation of which he was president. From the record before the court it appears that the negotiations were first carried forward by him in the name of the corporation, but as they began to give promise of consummation the appellant though remaining president of the corporation conceived the idea of continuing the negotiations in his own name. The record discloses that, when these negotiations had reached the point where a sale to the appellee appeared probable, he then procured from the corporation an option to purchase the property in his own name at a price much less than what he considered the actual value of the property and at a figure which is shown by the record not to have been a fair price and value for the property. It appears that he attemtpted to capitalize his knowledge of the affairs of the corporation, his knowledge of the property and his knowledge of the probable opportunity to sell the property at a fair price and value, to make a large profit for himself, which would not be participated in by other stockholders, from the sale of property of the corporation of which he was the president.

The record does not show that the appellant took any advantage of the appellee. Appellee from the beginning had full knowledge that appellant was the president of Alachua Phosphate Company, and therefore appellee was charged with the knowledge that appellant could not occupy any relation toward appellee which would be inconsistent with his duty as such president·to trade for the interest and benefit of the owning corporation, that it was the duty of such president to procure the best price obtainable for the property. Under the facts alleged in the pleadings, which are sustained by the evidence, Dale could not have lawfully acted in behalf of Jennings in this transaction because his position as president of the owning company precluded his acting on behalf of Jennings. Appellee was charged with this knowledge and therefore Dale could have assumed no fiduciary relation with Jennings which would affect this transaction as between Dale and Jennings. Higgins v. Lansing, 154 Ill. 301; Purdy's Beach on Private Corporations, Sec. 740; Greenfield Saving Bank v. Simmons, 133 Mass. 415; Baker v. Nickerson, 112 Mass. 195.

The showing is that appellant sold and delivered all that he agreed to sell and deliver. That the sale was for a consideration equivalent to the fair value of the property at the time. That the appellee, with all the facts before him, took title to the property, delivered the sum of $400,000.00 as part payment on the purchase price and agreed to pay the balance of the purchase price in the sum of $350,000.00 with interest at 6% and to give notes and mortgage to secure the payment of the same and afterwards declined to carry out his agreement although he has capitalized the property at $1,000,000.00.

The appellee appears to have no equities in his favor upon which he can base a claim for relief against the pay-

ment of the balance of the purchase price of the property involved.

The record shows a state of facts which should preclude the appellee from retaining the property without paying the purchase price, which price is neither alleged or proved to have been at all in excess of the actual value of the property at the time of the sale and delivery.

Dale's conduct precludes specific performance in equity. Bush v. Baker, 79 Fla. 113, 88 South. Rep. 704.

Whether or not Alachua Phosphate Company may successfully maintain a suit to collect from Dale (should he collect the same) the balance of the purchase money for which the property was sold to appellee is a question injected into this cause by the evidence but which was not before the Chancellor for adjudication under the pleadings and which is therefore not to be determined by a decree entered in this cause.

The decree should be reversed and remanded with directions that a decree be entered in favor of appellant against th appellee for the sum of $350,000.00 with interest thereon at 6% per annum from the 19th day of December, 1919, and that appellant do have an equitable lien upon the property conveyed for the payment of such amount found to be due as the balance of the purchase price of such property.